[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for personal injuries sustained by the plaintiff as a result of a slip and fall on the premises of her employer. The plaintiff has brought this action against the named defendants who are the lessors of her employer and owners of the subject premises. The plaintiff received workers' compensation benefits as a result of her injuries and her employer, Home Intravenous Delivery Systems, Inc. d/b/a Option Care, has intervened in the suit to recover the compensation which it has paid to the plaintiff. The parties have stipulated that the amount of the workers' compensation lien for benefits paid to the plaintiff is $89,952.42.
FACTS
The evidence and testimony permit the court to make the following findings of fact and conclusions.
On May 23, 1994, the plaintiff, Bonnie Lee Legassey, was employed as a registered nurse by Home Intravenous Delivery Systems, d/b/a Option Care (hereinafter referred to as H.I.D.S.). She worked as an intravenous (IV) nurse clinician and made daily visits by car to homebound patients to provide them with intervenous services.
On said date the plaintiff was walking across a parking lot leased by her employer from the defendants on her way to her automobile to drive to see a patient. As she was walking with an armful of supplies, she stepped on the metal cover of an underground electrical junction box located near her automobile. As she stepped on it, the cover dislodged and came off exposing the empty box below. The plaintiff's right leg dropped into the box and she was caused to fall with considerable impact into the box up to her right hip. The fall caused her then to be thrown forward and as she attempted to brace her fall, her hands and right arm landed hard on the pavement.
As a result of her fall, the plaintiff sustained injuries to her right leg, hip, back, hands, right shoulder and neck.
The plaintiff was assisted back to her office where she and some fellow employees cleaned and treated the bruises and contusions she had sustained. She rested for a while and then left work and went home. CT Page 9373
The following day she was seen by her chiropractor, Dr. Ciarrelli. She made subjective complaints of neck, mid and low back pain as well as intermittent headaches and right shoulder pain. Objective findings included "cervical ROM limited with pain. . .lumbar ROM limited in forward flexion with pain. . .cervical compression elicited right sided neck pain. . .leg lowering caused bilateral low back pain. . ." (Pl. Ex. 3).
During the following months the plaintiff was seen by several other medical specialists including her physician, Dr. Brenes, an orthopedic surgeon, Dr. Beaumont, a back specialist, Dr. Taylor and a chiropractor specializing in back and spine rehabilitation, Dr. Zilahy.
On September 24, 1994, the plaintiff underwent right rotator cuff surgery which was performed by Dr. Beaumont at Waterbury Hospital. That surgery was followed by physical therapy for approximately a year, seven months of it at SCORE.
At the time of the accident the plaintiff was 39 years old, approximately five feet tall, 200 pounds. She testified that she had a history of approximately 10 years of somewhat related medical complaints prior to the present injury. They include a back injury in September 1986, when she bent to pick something up off the floor, which resulted in treatment and therapy for "two or three months." She also testified that she suffered another injury to her back in September 1989 when a patient forcibly yanked her hair as the plaintiff was bent over her, thereby causing back and neck pain. In October 1992 the plaintiff reportedly slipped on rain soaked steps at her condominium in St. Maarten while on vacation landing hard on her rear end down four or five cement steps. She saw Dr. Ciarelli for those injuries and continued to see him on average for once a month for the year prior to the accident "as maintenance and preventative care." She testified that notwithstanding these incidents and treatment, she was working 36 to 40 hours per week and was "essentially fully functional" at the time of the instant accident.
The plaintiff continues to complain of pain and disability resulting from her fall.
On March 7, 1995, the plaintiff was examined by Dr. William Fisher. Dr. Fisher testified at trial concerning his examination and his findings. He testified, in part, that the plaintiff has a CT Page 9374 full range of motion in her cervical spine, some limitation of movement in her right shoulder, flexion that is somewhat limited due to pain in her lumbosacral area, and a full range of flexion in her hips. His diagnosis includes "chronic lumbosacral spine strain/sprain". He concludes his report by finding that "Dr. Beaumont's estimate of 20% permanency of the upper right extremity is reasonable". He further concluded that the fact of the plaintiff's preexisting problems in her low back "makes her current problem in the lumbosacral area materially and significantly worse." The plaintiff's permanent partial disability of the lumbosacral spine was found by him to be 15% — "with 5% of the total pre-existing." (Pl. Ex. 15).
On the stand, Dr. Fisher reiterated his opinion that the plaintiff's 10 years or more of chronic recurrent lower back problems made the injuries sustained in the instant fall worse. The court finds that the plaintiff's permanent partial disability of the upper right extremity to be 20% and of the lumbosacral spine to be 10% — each as a result of this accident.
THE DAMAGES
The plaintiff offered evidence and testimony that she has incurred approximately $33,462.49 in medical care and treatment as a result of the injuries she sustained in her fall. Of that figure approximately $10,000.00 was for chiropractic treatment and approximately $10,000.00 was for physical therapy over a nine month period. (Pl. Ex. 1).
She offered additional testimony that to date she had been unable to resume her employment due to the residual effects of the injuries. Specifically, she remains unable to sit or drive for extended periods of time, unable to stand for long periods, unable to lift even moderately heavy items and unable to do repetitive tasks including bending.
The plaintiff offered evidence that her adjusted gross income from employment in 1992 was approximately $51,037.00 and approximately $49,462.00 in 1993. In 1994, the year of the accident, she only worked for one-half the year and reported her income from employment to be $20,006.00. (Pt. Ex.23, 24 and 25).
LIABILITY
As previously noted, the plaintiff's fall occurred in the CT Page 9375 parking lot her employer leased from the defendants as part of its premises. The plaintiff was acting in the performance of her employment duties at the time of her fall.
The plaintiff's claim that the defendants are responsible for the hazardous condition of the metal cover on the in-ground electrical junction box is supported by the evidence. Robert Tendler who, as owner of H.I.D.S, was the plaintiff's employer and the lessee of the subject premises including the parking lot. Mr. Tendler testified that the problem with the loose metal cover had been reported to him by some of his employees and that he, in turn, had reported it to Felix Merante, an owner of the property. One of the employees who complained to Tendler was Sandie Pieger who testified at trial that she personally had run over the metal cover on a number of occasions and it had flipped up and hit the back of her car. She verbally reported that fact to Tendler who stated to her that he would take the matter up with Merante. Tendler testified that on three separate occasions, which he could recall, he discussed the problem with Merante during the year before the accident. On one occasion he asked Merante if there was any reason why the box couldn't be covered up. On another occasion he contacted Merante to complain that a snow plow had dislodged the cover from the box.
Felix Merante, the first named defendant, testified at the trial in regard to the defendants' lack of knowledge of the defective metal cover. He testified that while he and Tendler had many conversations during the six years of Tendler's lease, he did not recall a single conversation in which Tendler or anyone else brought the defective metal cover to his attention. He testified that he or his employees periodically check the premises for problems, but never noticed anything wrong with the electrical junction box or its metal cover. The first he heard of it was after the accident and he took efforts to fix the problem. The court finds his testimony to lack credibility.
There was no evidence to permit a finding that the defendants took appropriate steps to correct the problem or to reduce the risk to persons using the parking lot.
Based upon that evidence and testimony, the court finds that sufficient evidence and testimony was elicited to permit the court to find that the defendants had the duty to maintain and keep in good repair the parking lot and that they knew or, in the performance of those duties, should have known that the metal lid CT Page 9376 on the electrical junction box was prone to become loose and to come out of position thereby creating a risk and a hazard to persons using the parking lot.
CONCLUSION AND JUDGMENT
The plaintiff, through her counsel, offered considerable data to the court to support her claim as to what a proper monetary award should be under all the circumstances. That data included the claim of permanent partial disability suffered by the plaintiff and the consequential effects such disability will have on the plaintiff. It also included a claim, based on the plaintiff's life expectancy, as to the diminution of her future activities and future earnings.
The court has considered those facts together with all of the evidence and testimony offered at trial in arriving at the following findings:
The court finds that the defendants were negligent in the maintenance of the premises where the plaintiff was injured and that their negligence was the proximate cause of the plaintiff's injuries.
Accordingly, judgment is to enter for the plaintiff and against the defendants in the following amounts:
Economic damages, past and future $252,000
Non-economic damages, past and future 133,000
Total damages $385,000
The court finds that the percentage of negligence of the plaintiff, Bonnie Lee Legassey to be 0%, and the percentage of negligence of the defendants to be 100%.
Accordingly it is ORDERED that judgment enter on behalf of the intervening plaintiff, Home Intravenous Delivery Systems, Inc. d/b/a Option Care and against the defendants in the amount of $89,952.42.
And it is FURTHER ORDERED that judgment enter on behalf of the plaintiff, Bonnie Lee Legassey, and against the defendants in the amount of $295,047.58. CT Page 9377
Joseph W. Doherty, J.